## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

PATRICIA D. WILLIAMS,                    )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )        No. 2:19-CV-88 RLW
                                         )
ANDREW M. SAUL,                          )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## MEMORANDUM AND ORDER

Plaintiff Patricia D. Williams brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. For the reasons that follow, the decision of the Commissioner is reversed.

### I. Procedural History

Plaintiff filed her application for DIB on April 4, 2017, and on May 6, 2017, she filed for SSI. (Tr. 200-8). Plaintiff alleged she had been unable to work since March 6, 2017, due to pancreas divism, irritable bowel syndrome (IBS), migraines, fibromyalgia, sphincter of the oddi dysfunction, depression, and anxiety. (Tr. 237). Plaintiff later amended her onset date to May 5, 2017. (Tr. 220). Plaintiff's application was denied on initial consideration, and she requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff and counsel appeared for a hearing on October 25, 2018. (Tr. 66-102). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. Id. The ALJ also received testimony from vocational expert ("VE") Elizabeth Wheeler. Id. On March 15, 2019, the ALJ issued an unfavorable decision

finding Plaintiff not disabled. (Tr. 15-28). On May 14, 2019, Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. (196-96). On October 28, 2019, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6).

In this action for judicial review, Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff argues that the ALJ improperly weighed the opinion evidence from her treating physician. Plaintiff also argues that the ALJ erred in assessing her RFC and that it was not properly supported by evidence in the record. Plaintiff requests that the decision of the Commissioner be reversed, and that the matter be remanded for an award of benefits or for further evaluation.

## II.  Evidence Before the ALJ

### A.  Relevant Medical Evidence[1]

Relevant medical evidence in the record indicates that on September 6, 2016, plaintiff presented to J. Tod Sylvara, D.O., at the LaPlata Family Clinic for sore throat and feeling rundown.[2] At the time she was being prescribed Zoloft, Ambien, Naprosyn, and Buspar. Plaintiff was assessed as having an abscess and was referred to an ENT. (Tr. 379).

On February 24, 2017, Plaintiff underwent a fiberoptic larngopharngoscopy, the results of which were normal. Plaintiff's chief complaint was swollen lymph nodes on both sides of her neck. It was noted in the treatment records that Plaintiff complained of daily flu-like symptoms since August 2016. (Tr. 420)

---

[1]The Court will only summarize Plaintiff's medical records as they pertain to physical impairments at issue in this case, as Plaintiff admitted she could work, but for her physical symptoms. (Tr. 85-86).

[2]At the time, Plaintiff was employed at the LaPlata Family Clinic as a nurse's assistant. (Tr. 72, 420). She testified that she last worked May 6, 2017. (Tr. 72).

On February 27, 2017, plaintiff was seen at urgent care at Complete Family Medicine complaining of general muscle aches, joint pain, and fatigue which were ongoing for seven months. (Tr. 452).  Plaintiff was prescribed Vivlodex and referred for an appointment with a rheumatologist. (Tr. 455)

On March 7, 2017, Plaintiff was seen by Veysel Tahan, M.D., at the UP-Digestive Health Clinic with a chief complaint of diarrhea, which had started in August 2016.  She was referred for a colonoscopy and stool study.  (Tr. 414)

Plaintiff return to Dr. Sylvara on March 13, 2017, for body aches, joints hurting, extreme fatigue, headaches and dizziness. Some of Dr. Sylvara's notes are illegible, and for Plaintiff's assessment the doctor wrote, "HRN."  (Tr. 377).  The Court is unfamiliar with this abbreviation.

Plaintiff was seen in the ER on March 20, 2017, for abdominal, joint, and back pain.  She described the pain as unbearable.  She stated that she attempted to see her attending doctor but was referred to the ER.  The ER ran some laboratory tests, which were unremarkable.  Plaintiff was given PO Norco for pain.  A follow up was scheduled with a rheumatologist.  (Tr. 408).

An endoscopy and colonoscopy were performed in March 2017.  Results from pathology noted Plaintiff had benign duodenal mucosa with changes suggestive of chronic duodenitis.  She also had benign colonic mucosa with no histopathologic abnormality, and mild chronic antral and oxyntic gastritis without activity.  (Tr. 398, 403).

On April 1, 2017, Plaintiff returned to Dr. Sylvara for chest pain. She stated it hurt to take deep breaths, and she was unable to eat and keep food down. She was assessed as having gastroenteritis and was treated with Zofran, Tylenol, and increased fluids.  (Tr. 375).

Plaintiff was seen by Bhagirath Katabamna, M.D., at the Hannibal Clinic on April 6, 2017. (Tr. 479).  Plaintiff complained of nausea and loose stools. The physician wrote "She probably has some sort of functional dyspeptic type symptoms. She is also was worried about connective tissue

3

disease and that she might have lupus. A sphincterotomy of the minor papula." (Tr. 480).  The

treatment plan was for Plaintiff to take Lactaid every day for a week and antinausea medication.

On April 18, 2017, Plaintiff was seen by Celso Raul Velazquez, M.D., for a rheumatology

consult.  Plaintiff's chief complaint was chronic pain.  Dr. Velazquez wrote the following summary

of Plaintiff's history:

> [Plaintiff] is a 42-year-old Caucasian lady who describes fatigue and feeling
> rundown since last year August and pain all over her body since the beginning of
> this year. She describes pain in her joints including ankles, knees, hips, elbows
> primarily but then all her joints hurt on and off. She also describes pain in her
> muscles from her neck up to back, arms and thighs. She describes the pain in her
> joints as dull ache which is present both in the morning and in the evening. Physical
> activity makes it worse. Nothing seems to make it better. She also describes tingling
> in her hands on and off. She has noticed burning of her skin as well now and then
> and sometimes her clothes hurt as well. She also has been having difficulty in
> concentrating and memory.  She describes extreme fatigue and low-grade fever of
> 99-100.  She has also noticed night sweats and difficulty falling and staying asleep
> and weight gain of 15 pounds over the last 6-7 months. ... She denies any chest
> pain but endorses shortness of breath and cough productive of occasional brownish
> phlegm.  She has history of IBS and gets abdominal pain associated with nausea,
> vomiting and heartburn.  She also gets diarrhea on and off but no hematochezia. No
> history of Dysuria or hematuria. She gets almost daily headaches since the
> beginning of this year in the front or occipital region. ...

(Tr. 385-86).

On physical exam, Plaintiff had "exquisite tenderness to palpation in the upper back, mid

back, lower back, arms, thighs and legs. Tenderness to palpation in bilateral hands, wrists, elbows,

feet and ankles. No synovitis of any joint noted. Range of motion of all joints is within normal

limits." (Tr. 387).  Dr. Velazquez wrote he believed Plaintiff's symptoms were most suggestive of

fibromyalgia. (Tr. 388). Different treatment options were discussed, including a trial for Cymbalta.

It was noted that Plaintiff may benefit from either gabapentin or Lyrica. Nonpharmacological

treatments were also discussed, including regular exercising, stretching, and water therapy.  (Tr.

388).

On April 26, 2017, Plaintiff presented to the Complete Family Medicine Clinic for muscular skeleton pain over her entire body. Plaintiff was seen by a nurse practitioner, Donna Whitely, FNP. "Plaintiff states that she was seen by her rheumatologist with no relief.  She states that she will need refills if we don't change up her medications." (Tr. 444).  She was prescribed Amitriptyline, cyclobenzaprine, and Neurontin. (Tr. 445).

Plaintiff returned to the Complete Family Medicine Clinic on May 2, 2017, and she underwent an EKG and bloodwork. (Tr. 439).  Plaintiff returned on May 10, 2017, for follow up with lab tests.  It was noted in her chart that there was an onset of fibromyalgia one month ago. (Tr. 432).  Plaintiff stated she could sleep 24 hours a day. Plaintiff had elevated triglycerides, a vitamin D deficiency, and thrush.

Plaintiff was seen by Umar Daud, M.D., at the Hannibal Clinic as a new patient on May 19, 2017, "to rule out lupus." (Tr. 484).  Plaintiff complained of body aches and joint pain in her elbows, knees, ankles, and hips. She complained of muscle pain, numbness and tingling, elevated blood pressure, low grade fever, puffy eyelids, fatigue, migraines, ringing in her ears, dry eyes, dizziness, tongue tingling, dropping things, and trouble with formation of speech. (Tr. 485).  Upon exam, Plaintiff's strength was five out of five in all extremities and equal in distribution, with no spinal tenderness. The doctor reviewed the test results and medical records Plaintiff brought with her.  He wrote that Plaintiff had positive ANA with multiple symptoms. "Some are suggestive of autoimmune disease and some are suggestive of chronic pain syndrome and fibromyalgia." (Tr. 487).  Dr. Duad referred Plaintiff for further lab testing and wrote that a follow up plan would be developed following the results.

Plaintiff returned to Complete Family Medicine on June 9, 2017, for a nurse visit with Ms. Whitley. She complained of musculoskeletal pain and vomiting. She stated the severity level was moderate, and that the pain was constant in her back, arms, legs, and shoulders.  The pain was also

described as piercing and sharp, with no injury. "Associated symptoms include decreased mobility and limping." (Tr. 492). Plaintiff was instructed to discontinue use of ibuprofen and to use Tylenol instead when taking Mobic. She was instructed to return to the clinic if her symptoms worsened. Plaintiff's current medications were listed as amitriptyline, Carafate, cholecalciferol, cyclobenzaprine, Mobic, Neurontin, Phenergan, vitamin D, and fish oil.

On August 14, 2017, Plaintiff returned to Ms. Whitely. She was assessed as having hypertension. She was prescribed lisinopril. (Tr. 753, 756). Plaintiff was again seen by Ms. Whitely on September 18, 2017. At the office visit, Plaintiff complained of dizziness and headache. (Tr. 746). Plaintiff was assesses as having hypertension, acute serous otitis media in her left ear, cough, and acute sinusitis.

On October 13, 2017, Plaintiff returned to Dr. Daud for a follow up appointment. (Tr. 570). Dr. Daud listed her complaints as body aches and joint pains in her elbows, knees, ankles, and hips. "She complains of muscle pain, numbness and tingling and elevated blood pressure and low-grade fever, puffy eyelids, fatigue, migraines, ringing in the ears, dry eyes, dizziness, tongue tingling, dropping things and trouble with formation of speech." (Id.) Upon examination, the doctor noted Plaintiff had no synovitis; strength was 5 out of 5 in all extremities and equal in distribution with no spinal tenderness. Laboratory results were negative for lupus. "Plaintiff is taking treatment [for] fibromyalgia including gabapentin and Cymbalta with good results." He advised exercise and follow up in 6 months. (Tr. 576)

In November and December 2017, Plaintiff was seen three times by Ms. Whitely at Complete Family Medicine for cold symptoms associated with acute sinusitis. (Tr. 727-44).

On November 29, 2017, Plaintiff was seen by Humam Farah, M.D., on referral for sleep apnea. Her current symptoms were listed as occasional difficulty initiating sleep, dry mouth, daytime sleepiness, witnessed apnea, and loud snoring, "the majority of which had been present

6

for years." (Tr. 519).  Dr. Farah did a physical exam and noted no tenderness, muscle strength was a 5 out of 5.  Muscle tone was normal, as was her gait and station.  A sleep study was ordered. Plaintiff returned to Dr. Farah on December 19, 2017.  She was diagnosed with mild sleep apnea and provided a CPAP machine and educated about its use.  (Tr. 585, 588-89).  Plaintiff returned to Dr. Farah on December 19, 2017, for a follow up for her sleep apnea.

Plaintiff returned to Dr. Velazquez on January 16, 2018, for a follow up for fibromyalgia. Her current medications were listed as: Gabapentin, Flexeril, Mobitz, duloxetine, and vitamin D. Plaintiff stated that she was doing overall better on Gabapentin.  Plaintiff stated that on "some days the pain is bad. She has pain in her joints particularly in her ankles, knees, elbows and hips. She also has pain in the muscles and even sometimes in the skin. She sleeps poorly. She does cough a lot at night. She is not rested in the morning." (Tr. 680).  Upon physical examination, it was noted that strength and gait were normal.  "She has no synovitis, enthesitis, or dactylitis.  All joints are cool with good range of motion." (Id.) He noted Plaintiff's fibromyalgia was "a bit better," and he continued her on Gabapentin and started amitriptyline to help with insomnia and non-restful sleep. (Tr. 681).  Dr. Velazquez recommended follow up in 6 months.

Five days later, on January 21, 2018, Plaintiff visited the urgent care at Complete Family Medicine for cold symptoms. (Tr. 792).  At her visit, Plaintiff complained of dizziness. The next day, January 22, 2018, Plaintiff returned and was seen by Justin Puckett, D.O., for dizziness and sleep problems.  (Tr. 784).

Plaintiff returned to Dr. Puckett on January 29, 2018, complaining of flu-like symptoms and musculoskeletal pain. (Tr. 772).  She presented with back pain, cough, fatigue, fever, generalized weakness, and headache.  Plaintiff described her musculoskeletal pain as aching, piercing, and throbbing.  She stated that it was aggravated by bending, lifting, and movement.

Plaintiff was assessed as having an acute upper respiratory infection. She was tested for influenza and prescribed Tamiflu. (Tr. 775).

Plaintiff was again seen by Dr. Puckett on February 5, 2018, for fatigue, dizziness, and gastroesophageal reflux disease (GERD). (Tr. 764). Plaintiff also complained of back pain, difficulty concentrating, headache, and muscle weakness. Plaintiff was prescribed Protonix for GERD symptoms.

Plaintiff returned to Dr. Velazquez on February 21, 2018. "She tells me today that everything hurts." (Tr. 682). Plaintiff complained of headache and daily pain in her upper back and shoulders, which she described as moderate and worse with activity. Upon physical examination, she was again described as having muscle and joint pain with "no synovitis, enthesitis, or dactylitis. All joints are cool with good range of motion." (Tr. 682). The doctor increased the dosage of Gabapentin. He recommended follow up in 6 months.

Plaintiff returned to Dr. Farah on April 06, 2018, for sleep apnea, shortness of breath, swelling and edema. (592). It was noted Plaintiff has shortness of breath and cough with activity, and that she was a smoker. The doctor ordered laboratory testing and a chest x-ray, plus Zithromax for sinusitis. The results of the chest x-ray were normal.

Plaintiff was seen by Dr. Sylvara at the LaPlata Clinic on April 7, 2018, where she was seen for edema in her ankle and legs. (Tr. 668). Plaintiff was prescribed Lasix.

Plaintiff returned for a follow up with Dr. Velazquez on August 21, 2018. Plaintiff reported that "she is quite achy lately because she has been gardening a lot." (Tr. 684). She reported persistent lower back pain for three weeks. "The pain is mild to moderate and she has been sleeping in a recliner." Id. Plaintiff indicated that she was taking Ibuprofen 600 mg once or twice daily "with some improvement." Id. On physical exam, she had mild lumber paraspinal tenderness.

The doctor believed her back pain was likely mechanical. Dr. Velazquez assessed plaintiff's fibromyalgia as "doing well on gabapentin and Flexeril." (Tr. 685).

Plaintiff returned to Dr. Sylvara on September 28, 2018. She complained of migraines, earache, sore throat, sinus drainage, and achy joints. (Tr. 666). The doctor prescribed allergy medications and Maxalt for migraines.

Plaintiff returned to Dr. Velazquez on October 16, 2018, with severe back pain. (Tr. 686). She also complained of fatigue, low energy, and joint and muscle pain. Plaintiff reported she has been sleeping in a recliner because of her back and widespread pain. Upon physical examination, she was described as having "no synovitis, enthesitis, or dactylitis. Mild lumber paraspinal tenderness. Widespread joint pain and stiffness on palpation. All joints are cool with good range of motion." (Tr. 686). The doctor described her fibromyalgia as "persistently active." (Tr. 687). "She is doing reasonably well on gabapentin, Flexeril and duloxetine. I do not have any other medications to add except to try an anti-inflammatory. I will call in etodolac 400MG twice daily." Id.

### B. Testimony at Administrative Hearing

#### 1. Plaintiff's testimony

Plaintiff testified at the hearing on October 25, 2018. She testified that she was 44 years old and the last time she worked was May 6, 2017.[3] (Tr 72). According to Plaintiff she has not worked since the job at LaPlata Family Practice, where she worked as a nurse's assistant. (Tr. 73). Plaintiff testified that during the last three months on the job, she missed

---

[3]There are some inconsistencies in the record. It was noted in the Complete Family Medicine medical records that in late 2017 and early 2018, Plaintiff was working part-time as a pharmacy technician at LaPlata Pharmacy. (Tr. 728, 739, 765, 779). On January 16, 2018, Dr. Velazquez wrote in his treatment notes that Plaintiff was currently working part-time as a medical assistant. (Tr. 680).

two to three days a week due to pain.  (Id.)  Plaintiff testified that she is married and has three children, none of whom are under 18 or live at home.  (Tr. 74).  She is 5'4" and weighs 170 pounds, and according to Plaintiff, has gained 20 pounds since she last worked due to inactivity. She has a high school education with some college but no degree. (Tr. 76)

Plaintiff testified her fibromyalgia causes flu-like aches in her joints and muscles throughout her entire body.  She testified that she experiences flares one to two times a month that last three to seven days.  During those flares, Plaintiff testified that she is completely exhausted, in pain, and seldom leaves her recliner. According to Plaintiff, she spends her days propped up with pillows in the recliner. (Tr. 77).  During a flare, she spends six hours in the recliner out of an eight-hour day.  When she is in her recliner, Plaintiff testified that she keeps pillows under her feet and ankles and on each side to create a zero-gravity position where there is no real weight on her body. She also uses a neck roll, a heating pad, and the recliner is heated. She will also heat up a moist towel for her neck once a day, which she uses for two to three hours. (Tr. 78-79)

Plaintiff testified that even when she is not having a flare, she still must sit and relax due to fatigue, and that she is in the recliner four to five hours, and she naps two to three times a day just about every day for a total of three to four hours. (Id.) According to Plaintiff, these are not planned naps; she just falls asleep.  She believes this is caused by the fibromyalgia, as well as the medicine she takes for it. (Tr. 80)

Plaintiff testified that she also has IBS.  According to Plaintiff, she has sudden urgent needs to run to the bathroom due to diarrhea.  This happens two to three times every day. (Id.) Plaintiff testified that she will be on the toilet ten minutes and experiences cramping one out of three trips to the bathroom. Plaintiff testified that her IBS is entirely independent from her fibromyalgia flares, and she takes Carafate for the cramping. (Tr. 81)

Plaintiff also testified that she has sleep apnea and uses a CPAP machine, which she tolerates, but still feels tired all the time.  She also testified that she has migraines three to four times a month that last two to three days.  According to Plaintiff, they can be accompanied by nausea but not to the point of vomiting. (Tr 82).  Plaintiff testified that for migraines she will take amitriptyline and Imitrex, and place a warm rag over her eyes, and lie down in a dark room for at least a couple hours.  Plaintiff also testified that she has tinnitus which causes a constant ringing in both ears. (Tr. 83).  Plaintiff does not recall it ever going away; it gets louder with the migraines.  Plaintiff testified that her tinnitus interferes with her ability to watch TV or talk to people.  She also has rainbow floaties that come and go across her vision. (Tr. 84)

Plaintiff testified that she receives treatment from Reggie Westhoff for depression and bipolar.  According to Plaintiff, she felt down all the time and had crying spells four out of seven days before medication, but now the crying is rare.  Plaintiff testified that medication also eliminated her mania.  She testified that she was experiencing days without sleeping, but now she sleeps a lot. (Tr. 85).  According to Plaintiff, if her physical problems went away, she would be able to work with the mental health issues she has. (Tr. 85-6).  Plaintiff testified that she takes the following additional medications: Etodolac, Gabapentin, Flexeril, Latuda, Meclizine, Promethazine, Cymbalta, Linzapril, Ranitidine, Metoprolol and Protonics.  Plaintiff testified that the only side effect she had from the medications is fatigue and, according to Plaintiff, she rarely drives because she fell asleep driving. (Tr. 86).

Plaintiff testified that she no longer drives because she has fallen asleep while driving.  When she is having a fibromyalgia flare, she stated that does not get in a car; otherwise she can sit in a car comfortably for 45 minutes.  She goes shopping once a week but must lean on the cart.  During a flare, she can neither shop nor do housework. (Tr. 87).  When she is not

having a flare, Plaintiff testified that she could do little chores like dust for five to ten minutes, but she must go back to her recliner to rest for a couple hours.

Plaintiff testified that her sleep is interrupted during the night a couple times. She goes to bed at 8:00 or 9:00 p.m., and she gets up between 6:00 and 8:00 a.m.  Plaintiff testified that on a good day she can sit comfortably in a regular chair for ten minutes before it gets uncomfortable, but that during a flare, she can sit only for five minutes.  She also testified that on a good day she can stand for ten minutes, but only five minutes during a flare. (Tr. 88). She testified that she could walk a couple of blocks on a good day, but only a block during a flare.  She testified that she could lift five pounds on a good day, but during a flare, she can lift less than five pounds. (Tr. 89)

The ALJ noted that in the medical records a doctor had noted that Plaintiff was gardening and growing tomatoes and cucumbers.  Plaintiff clarified that the doctor had asked her what she liked to do, but she testified due to her muscle weakness she no longer gardened, and that her husband had mowed the garden under.  Plaintiff testified that under a doctor's recommendation, she did try to walk every other day, but she had shortness of breath and was unable to do so, and the doctor gave her stretching exercises to do instead. (Tr. 93).

### 2.  Vocational Expert testimony

Elizabeth Wheeler, a vocational expert, testified that Plaintiff's past work was pharmacy technician (DOT 074.382-010, SVP 3, light); retail manager (DOT 185.167-026 light, skilled SVP 7, performed at medium); and group aide (DOT 355.674-014, medium, performed at light, SVP 4). (Tr. 94)

The ALJ posed a hypothetical of a person the same age, education, and past work as Plaintiff who could perform light exertional level work, but less than occasionally can climb

ropes, ladders or scaffolds, can frequently climb ramps or stairs, frequently kneel, crouch or crawl, and avoid concentrated exposure to excessive vibration, unprotected heights, and workplace hazards such as dangerous, moving machinery.  According to the VE, Plaintiff's past work as a pharmacy tech and retail manager would available. (TR 95) Additional jobs would be mail clerk (DOT 209.687-014, 91,300 jobs nationally); assembler (DOT 737.687-010, 251,010 jobs nationally); housekeeper (DOT 323.687-014, 135,369 jobs nationally). These are all light jobs with SVP of 2. (TR 97)

The second hypothetical added simple routine tasks with only occasional interaction with the public. According to the VE, this would eliminate Plaintiff's past work, but the three other jobs remain. A third hypothetical reduced work to the sedentary level and added that Plaintiff could never climb ladders, ropes or scaffolds, could occasionally climb ramps or stairs; occasionally stoop, kneel, crouch, or crawl, and she must avoid concentrated exposure to excessive vibration, workplace hazards such as dangerous, moving machinery, and unprotected heights. Under this hypothetical, the VE found Plaintiff's past work would be out, but she could perform other jobs including document preparer (DOT 249.587-018, 150,512 jobs); assembler (DOT 734.687-018, 251,687 jobs); and hand bander (DOT 920.687-010, 23,201 jobs).  (Tr. 98-99)

At the sedentary level, if limited to simple, routine tasks and occasional interaction with the public, the VE opined Plaintiff could not perform her past work, but the three jobs identified remain. If the hypothetical person misses two days of work per month, however, this will eliminate all unskilled work.  If the person required two extra breaks of 10 to 15 minutes, it

would eliminate these jobs and all others. (Tr. 99-100).  If a person were off task 20%, it would eliminate all jobs. (Tr. 101)

### III.  Legal Standard

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Second, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, then he is not disabled.  Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

At the fourth step, if the claimant's impairment is severe but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i).  An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011); see also 20 C.F.R. § 416.945(a)(1). Ultimately, the claimant is responsible for providing evidence relating to his RFC, and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

In the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production shifts to the Commissioner to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy.  See Brock v. Astrue, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. Id. In the fifth step, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. Hensley, 829 F.3d at 932.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted. Under this test, the Court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Id. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 370 (8th Cir. 2016).

## IV.  The ALJ's Decision

In a decision dated March 15, 2019, the ALJ applied the above five-step analysis and found Plaintiff had not engaged in substantial gainful activity since March 6, 2017; Plaintiff has the severe impairments of gastroenteritis, esophagitis, IBS, and fibromyalgia. (Tr. at 18); and Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 21).

16

As for Plaintiff's RFC, the ALJ found Plaintiff retained the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[4] but that she had the following additional functional limitations:

> [S]he can less than occasionally climb ladders, ropes, or scaffolds; can no more than frequently climb ramps or stairs; can no more than frequently kneel, crouch, or crawl; and must avoid concentrated expose to excessive vibration and workplace hazards, such as dangerous, moving factory-type equipment or unprotected heights.

(Tr. 22)

At the fourth step, the ALJ found Plaintiff was unable to perform her past relevant work. (Tr. 26). At the fifth step, relying on the VE's testimony and considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs existing in significant numbers in the national economy which the Plaintiff could perform, including mail clerk, assembler, and housekeeper. (Tr. at 27). At the end of her analysis, the ALJ concluded Plaintiff was not disabled. (Tr. 28).

## V. Discussion

Plaintiff argues the ALJ's decision regarding Plaintiff's RFC is not supported by substantial evidence in the record. More specifically, she faults the ALJ for not given proper weight to the opinion of her treating rheumatologist, Dr. Velazquez. She further contends there is no evidence to support the ALJ's RFC assessment, because the ALJ relied, in part, on the opinion on a non-treating, non-examining medical source. She also argues that the ALJ made her own independent medical findings and improperly drew inferences from medical reports. She claims

---

[4]Light work involves lifting no more than 20 pounds with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567. To be considered capable of performing light work, a claimant must be able to do "a good deal of walking or standing." Id. The Eighth Circuit recognizes that "[l]ight work requires that a claimant be capable of standing or walking for a total of six hours out of an eight-hour workday." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995).

the ALJ cherry-picked "normal" medical evidence from the medical records, while ignoring Plaintiff's myriad of problems. Finally, Plaintiff contends the ALJ improperly discounted Plaintiff's subjective complaints of pain, and her findings regarding Plaintiff's daily activities were not supported by the record.

### A. **RFC Standard**

RFC is what a claimant can do despite his or her limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545, 416.945. The RFC is a function-by-function assessment of an individual's ability to do work-related activities on a regular and continuing basis. SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). "[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, and the claimant's own descriptions of his or her limitations. Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017); Pearsall, 274 F.3d at 1217. According to the Eighth Circuit, "Ultimately, the RFC determination is a 'medical question,' that 'must be supported by some medical evidence of [the claimant's] ability to function in the workplace.'" Noerper v. Saul, 964 F.3d 738, 744 (8th Cir. 2020) (quoting Combs, 878 F.3d at 646); see also Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008) (ALJ's RFC assessment must be supported by medical evidence). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (some medical evidence must support the determination of the claimant's RFC). An ALJ's RFC determination should be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

It is the claimant's burden to establish his or her RFC.  Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  However, the ALJ has an independent duty to develop the record, despite the claimant's burden.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The ALJ must neutrally develop the facts.").  "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).  In some cases, the duty to develop the record requires the ALJ to obtain additional medical evidence, such as a consultative examination of the claimant, before rendering a decision.  See 20 C.F.R. §§ 404.1519a(b), 416.945a(b).

**B.  The ALJ's Evaluation of Dr. Velazquez's Opinion**

Plaintiff's first argument is that the ALJ improperly discounted the opinion of Dr. Velazquez, Plaintiff's treating rheumatologist.  For claims like Plaintiff's that are filed on or after March 27, 2017, an ALJ evaluates medical opinions and administrative medical findings pursuant to 20 C.F.R. § 404.1520c.  These new rules provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a).  An ALJ is to evaluate the persuasiveness of medical opinions and prior administrative medical findings in light of the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant, which includes: (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies." 20 C.F.R. § 404.1520c(a)-(c).

Under the new regulations, supportability and consistency "are the most important factors" to consider when determining the persuasiveness of a medical source's medical opinions and, therefore, an ALJ must explain how he considered the factors of supportability and consistency in his decision.[5] 20 C.F.R. § 404.1520c(b)(2).  An ALJ may, but is not required to, explain how he considered the remaining factors.  Id.; see also Brian O. v. Comm'r of Soc. Sec., No. 1:19-CV-983-ATB, 2020 WL 3077009, at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how persuasive he or she finds all of the medical opinions.'" (alterations omitted)).

On October 16, 2018, Celso Raul Velazquez, M.D., completed a standardized medical source statement, which gave his opinion as to Plaintiff's physical limitations. (Tr. 675-78). Dr. Velazquez indicated Plaintiff had the maximum ability to lift and carry on an occasional basis no more than 10 pounds, and on a frequent basis less than 10 pounds; that in an 8-hour day, she had the maximum ability to stand for 2 hours and sit 2 hours; that she could only sit for 60 minutes before she would need to change position; that she could walk for 3-4 hours; and that she would need to lie down at unpredictable intervals during an 8-hour work shift.  He also opined that Plaintiff should never twist, stoop, crouch, climb stairs or ladders; that she could occasionally reach and manipulate using her upper extremities, but she could never use her lower extremities.

---

[5]"Supportability" refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Dr. Velazquez found Plaintiff should never be exposed to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gasses, soldering fluxes, solvents/cleaners, and chemicals. Based on her impairments and symptoms, he opined Plaintiff would be absent more than 4 days a month, off task 20% of the time, and need breaks 1-2 times a shift. Dr. Velazquez completed the form checklist, but he did not provide any written explanations in his statement. (Tr. 675-78).

The ALJ found Dr. Velazquez opinion to have limited persuasiveness. She wrote:

> Dr. Velazquez's opinions consist primarily of a standardized, check-the-box form in which he failed to provide supporting reasoning or clinical findings, which reduces the supportability of his opinions. Further, Dr. Velazquez's own pattern of treatment and treatment notes generally reflect conservative limited treatment without significantly supported physical examinations, diagnostic imaging, or objective testing, which does not support nor is consistent with his opinion of the claimant's need to miss work. Moreover Dr. Velazquez's opinions are not consistent with the medical evidence of record, particularly as discussed above, the claimant's conservative pattern of treatment, limited supporting clinical signs, and limited supporting diagnostic imaging or objective testing.

(Tr. 26).

Plaintiff argues the ALJ should not have discounted Dr. Velazquez's opinion based on the fact that he did not fill out the written portion of the form indicating what supported his findings. She asserts that the ALJ was under an obligation to look at the medical records for support or even contact the physician for additional evidence and clarification. She also contends the ALJ did not comply with 20 C.F.R. § 404.1520c because in her decision did not address Dr. Velazquez's relationship with Plaintiff, the length of treatment, the frequency of his examinations, the purpose of the medical treatment, the examining relationship, or his specialty in rheumatology, all of which, Plaintiff argues, support giving great weight to his opinion.

At the outset, the Court notes that under the new regulations, supportability and consistency "are the most important factors" to consider when determining the persuasiveness of a medical source's medical opinions, and these are the only two factors an ALJ must address when explaining the weight he or she assigned a medical opinion. 20 C.F.R. § 404.1520c(b)(2), see also Brian O.,

2020 WL 3077009 at *4. When evaluating a medical opinion, an ALJ should consider the other factors, but it is not error to omit discussion of these factors in a written decision. Id. In this case, the ALJ did comply with the regulations when evaluating Dr. Velazquez's opinion, in that she addressed consistency and supportability. The Court rejects Plaintiff's argument that the ALJ needed to address the other factors in her decision.

The ALJ found support for Dr. Velazquez's opinion was reduced because he completed a check-the-box form without written explanation. Despite Plaintiff's assertion otherwise, the ALJ did not discount out of hand Dr. Velazquez's opinion because it was a checklist without supporting explanations. This was just one factor she found reduced the supportability of his opinion, which is permissible under Eighth Circuit law. See Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (affirming an ALJ's assigning lesser weight to a physician's opinion in part because "the only explanatory statement on the checkbox form indicates that [the claimant] 'has fibromyalgia which causes a lot of joint pain for her.'"); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (affirming an ALJ's discounting of a physician's checklist-type opinion, because it consisted of "three checklist forms, cite[d] no medical evidence, and provide[d] little to no elaboration.").

The ALJ represented in her written decision that she did review treatment notes from Dr. Velazquez when she evaluated the persuasiveness of his opinion, and she addressed consistency and supportability, as required under the new regulations. That said, the Court finds some conclusions the ALJ reached about these two factors are not supported by the record. The ALJ found Dr. Velazquez's records did not support and were inconsistent with his conclusion about Plaintiff's need to miss work, because they showed conservative limited treatment without significantly supported physical examinations, diagnostic imaging, or objective testing. The Court finds this assertion is not supported by evidence in record, and it is inconsistent with observations

made by the Eighth Circuit and guidance provided the Commissioner of Social Security about fibromyalgia.

Dr. Velazquez, a rheumatologist at the University of Missouri Health Clinic, treated Plaintiff for fibromyalgia, which "is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, [and] can be disabling." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  The condition "often leads to a distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain." Id. Fibromyalgia is a chronic condition, and "[d]iagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests." Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004) (citing Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).  "Fibromyalgia is an elusive diagnosis, its cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) (internal citations omitted).  Social Security Ruling, SSR 12-2p provides guidance on how to review a claim involving fibromyalgia, which includes taking into account the fact that that pain symptoms and fatigue can come and go and may even be absent, and the importance of taking a longitudinal view of the record.  Ruling, SSR 12-2p; Titles II & XVI: Evaluation of Fibromyalgia, SSR 12-2p (S.S.A. July 25, 2012).

Earlier in her decision, the ALJ recognized that Plaintiff was diagnosed with fibromyalgia, "which does not necessarily lend itself to objective indicators," and yet, she discounted Dr. Velazquez's opinion because it was not supported by "physical examinations, diagnostic imaging, or objective testing." (Tr. 26).  With regard to physical examinations, Dr. Velazquez did examine Plaintiff on a number of occasions. (Tr. 388, 681, 682, 684, 686).  On April 18, 2017, at the visit when he diagnosed Plaintiff with fibromyalgia, Dr. Velazquez noted plaintiff had "exquisite tenderness to palpation in the upper back, mid back, lower back, arms, thighs and legs. Tenderness

to palpation in bilateral hands, wrists, elbows, feet and ankles." (Tr. 388). He also noted Plaintiff had difficulty in concentrating and memory and suffered from extreme fatigue. (Id.) Dr. Velazquez examined Plaintiff on four other occasions. On some visits he noted her pain was better, and other times it was worse. (Tr. 682, 684, 686). This pattern of improvements and setbacks is consistent with the symptoms of fibromyalgia. SSR 12-2p ("For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have bad days and good days.) (internal quotations omitted). Dr. Velazquez examined Plaintiff on October 16, 2018, the day he rendered his opinion, and he found Plaintiff to have "widespread joint pain and stiffness on palpation," and in his treatment notes he described her fibromyalgia as "persistently active." (Tr. 686). Based on a review of the record, the Court finds Dr. Velazquez did conduct physical exams, which were consistent with the symptoms of fibromyalgia, and it was error for the ALJ to have discounted his opinion on this basis.

As for the lack of objective testing and diagnostic imagining, Dr. Velazquez reviewed extensive past medical records from Plaintiff, which included testing results, but he did not order diagnostic imaging or other "objective testing." The ALJ faults Dr. Velazquez for a lack of testing and imaging, but the fact there was no objective testing or diagnostic imaging is not inconsistent with findings of impairment due to fibromyalgia. As the Eighth Circuit has stated, there are "no confirming diagnostic tests" for fibromyalgia, Forehand, 364 F.3d at 987, and its symptoms "are entirely subjective." Tilley, 580 F.3d at 681. That being said, fibromyalgia is a recognized severe impairment, which is diagnosed through physical examinations and the elimination of other conditions, which is what Dr. Velazquez did in this case. The Court finds it was also error for the ALJ to have discounted Dr. Velazquez's opinion regarding the impact Plaintiff's fibromyalgia had on her ability to work, based on a lack of objective testing or diagnostic imaging.

The ALJ also faulted Dr. Velazquez's opinion because the doctor's own pattern of treatment, and the treatment in the medical records in general, reflected "conservative limited treatment." (Tr. 26).  Fibromyalgia has no cure and the primary treatment is medication.  Tilley, 580 F.3d at 681 ("fibromyalgia is an elusive diagnosis; [i]ts cause or causes are unknown, there's no cure.") (quotation omitted).  Plaintiff saw Dr. Velazquez five times between April 18, 2017 and October 16, 2018, and during each of her visits, Dr. Velazquez reviewed and adjusted her medications, sometime increasing the doses of her existing medication, and sometime adding new medications.  On October 16, 2018, the doctor noted Plaintiff was on gabapentin, Flexeril, and duloxetine, which she was doing "reasonably well on," however, her fibromyalgia was still "persistently active," and he noted he had no other medication to add, except etodolac, which he did add.  (Tr. 687).  The ALJ's characterization of this treatment as "conservative" is inconsistent with the doctor's notations that he had tried all the available medications, and Plaintiff's condition was still persistent.

Earlier in her decision, the ALJ noted that the record does not reflect escalating treatment for Plaintiff's medical impairments, including fibromyalgia, such as increased frequency of treatment, physical therapy, assistive device usage, pain management, frequent emergency room visits, intensive specialist care, lengthy inpatient hospitalization, or surgery.  Inpatient hospitalization and surgery are not indicated for fibromyalgia.  Brosnahan, 336 F.3d at 677 (noting the American College of Rheumatologists does not recommend surgery for fibromyalgia), and it is unclear to which assistive devices the ALJ is referring.  As for "intensive specialist care," Plaintiff was regularly treated by a team of rheumatologists at the University of Missouri.  It is not apparent what additional "intensive specialist care" she should have pursued for treatment of her fibromyalgia.  The Court also finds that contrary to the ALJ's assertion, the medical records did show an "increased frequency of treatment," as well as some emergency room and urgent care

visits. Plaintiff was initially seen by Dr. Velazquez in April 2017. She did not return to him until January 2018. During that time, Plaintiff visited her primary care doctors, the emergency room, and urgent care ten times complaining of symptoms related to her fibromyalgia.[6] (Tr. 377, 408, 442, 445, 455, 484, 575, 666, 668, 764). Moreover, when Plaintiff returned to Dr. Velazquez in January 2018, he recommended she follow up in six months, but she returned to him in February, August, and October 2018 complaining of joint pain and fatigue. The medical records do show an increased frequency of treatment.

There is also evidence in the record to support pain management. As discussed above, prescription medication is the primary treatment for fibromyalgia, and there is ample evidence in the record that Plaintiff's physicians were trying to control her pain through medication, including, at times, narcotics. (Tr. 408).

The ALJ discounts Dr. Velazquez's opinion because she found Plaintiff's treatment records show a conservative course of treatment. There is no evidence in the record to suggest, however, that Plaintiff's treatment was conservative or that she did not pursue a valid course of treatment for her fibromyalgia. Bowman v. Barnhart, 310 F.3d 1080, 1084 (8th Cir. 2002) (The ALJ erred in considering that plaintiff had been treated medically, not surgically, when no medical evidence indicated that surgery would help the claimant's condition, and when no medical evidence suggested that the claimant had not been pursuing a valid course of treatment).

In evaluating the persuasiveness of Dr. Velazquez's opinion, the ALJ did discuss the factors supportability and consistency, as required by 20 C.F.R. § 404.1520c(b)(2). The Court finds, however, that the ALJ's findings regarding these two factors are not supported by the record, or are inconsistent with the symptoms of and treatment for fibromyalgia. The Court concludes the

---

[6]The Court has subtracted from this number Plaintiff's visits for cold symptoms, sleep apnea, and to rule out a cardiac condition.

ALJ improperly discounted the medical opinion of Dr. Velazquez, Plaintiff's treating rheumatologist.

## C. <u>Inadequate Medical Evidence Supporting the RFC</u>

Plaintiff also argues there is no medical evidence to support the ALJ's RFC assessment. Plaintiff argues that the ALJ improperly relied, in part, on findings of a non-examining consulting physician who evaluated the record at the very beginning of her claim.  Plaintiff further faults the ALJ for improperly making independent medical findings or drawing inferences from medical reports.  She also faults the ALJ for picking out things from the record that appear "normal" while ignoring the myriad of problems she suffered.

### 1. Dr. Tschudin's Opinion

While the ALJ found the opinion of Plaintiff's treating rheumatologist Dr. Velazquez to have limited persuasiveness, she found the prior administrative medical findings of Garland Tschudin, M.D., a non-examining, consulting physician, to have partial persuasiveness. Dr. Tschudin reviewed some of Plaintiff's medical records and rendered his opinion on July 17, 2017. Based on the records he reviewed, he found Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that in an 8-hour day she could stand for a total of 6 hours and sit for 6 hours; that she was unlimited in her ability to climb stairs, stoop, and balance; and that she could frequently climb ladders, kneel, crouch, and crawl.  (Tr. 112-14).  The ALJ found Dr. Tschudin's opinion was limited by the fact that it was based on the relatively early date at which he reviewed Plaintiff's file. (Tr. 25).  However, the ALJ found Plaintiff's physical condition was "generally stable and [did] not reflect . . . significant worsening" after July 2017, which led her to find Dr. Tschudin's opinion "partially persuasive" (Tr. 25-26).

It is unclear from the ALJ's decision how much the ALJ relied on Dr. Tschudin's opinion in determining Plaintiff's RFC.  The Court agrees with Plaintiff, however, that his opinion should

be afforded little or no weight.  The vast majority of Plaintiff's medical records are dated after Dr. Tschudin conducted his review, and the record does not show Plaintiff's condition was stable.  Her symptoms waxed and waned, which is typical for fibromyalgia, and she continued to seek treatment for pain and fatigue from her rheumatologists and primary medical doctors.  Moreover, Plaintiff's medications were often increased or changed, and in her last visit Dr. Velazquez indicated Plaintiff's fibromyalgia was persistent and there were no other medications to try save one.   Dr. Tschudin did not have this information when evaluating the impact Plaintiff's impairments had on her ability to work.  Also, Dr. Tschudin discounted Plaintiff's complaints of pain and chronic fatigue based on the fact that she said she could prepare simple meals and do household chores for a few minutes at a time.  (Tr. 114).  This was not a proper reason for discounting Plaintiff's symptoms of fibromyalgia, as discussed in more detail below.

## 2. The ALJ improperly drew inferences about Plaintiff's RFC from the medical records.

The ALJ also reviewed the records and noted that Plaintiff's physical examinations did routinely demonstrate "some musculoskeletal, neurological, gastrointestinal, or abdominal abnormalities or deficits, particularly intermittent tenderness, but routinely had no noted indication of significant abnormalities in extremity strength, muscle atrophy, gait, muscle tone, joint instability, sensation, reflexes, straight leg raise tests, or assistive devise usage and did not demonstrate a coherent picture of ongoing or recurrent objective indicator of functional deficits." (Tr. 23).  There is no indication in the records, however, how these observations made during a medical examination relate to Plaintiff's functional ability in the workplace.  The Eighth Circuit has warned that "an ALJ must not substitute his opinions for those of the physician." Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) (citing Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990)).  An ALJ is not permitted to "draw his own inferences about [a] plaintiff's functional ability from medical reports." Pates-Fire v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (noting that

ALJs may not "play doctor"); see also Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004);
Nevland, 204 F.3d at 857-58.

Here, like the ALJ in Combs v. Berryhill, the ALJ erred by relying on her own inferences
as to the relevance of medical notations such as "normal gait" and "no muscle atrophy" when
determining Plaintiff's ability to function in the workplace.  878 F.3d at 647.  Not unlike the record
in Combs, Plaintiff's medical providers wrote in their treatment notes that some of Plaintiff's
findings were normal, such as her gait, muscle strength, and reflexes, and the fact there was no
evidence of muscle atrophy, but Plaintiff's doctors also consistently noted muscle and joint pain
and chronic fatigue, and diagnosed her with fibromyalgia.  Plaintiff was prescribed pain
medications, including narcotic pain medication, and she frequently returned for treatment, which
is consistent with Plaintiff's claims of significant impairment.  O'Donnell v. Barnhart, 318 F.3d
811, 817 (8th Cir. 2003) (numerous attempts to find pain relief supportive of claimant's claims of
impairment).  By relying on her own interpretation of what terms such as normal gait and no
muscle atrophy meant in terms of Plaintiff's RFC, without medical evidence as to Plaintiff's
functional ability, "the ALJ failed to satisfy [her] duty to fully and fairly develop the record." Id.;
see also Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012) ("Failing to develop the record is
reversible error when it does not contain enough evidence to determine the impact of a claimant's
impairment on his ability to work.").  The Court finds that in assessing Plaintiff's RFC, the ALJ
made improper inferences about Plaintiff's ability to function in the workplace based on "normal"
notations in the medical records. The ALJ improperly relied on these notations while failing to
acknowledge other notations in the medical records regarding Plaintiff's muscle and joint pain and
chronic fatigue.

D. **Findings Regarding Plaintiff's Daily Activities**

Finally, Plaintiff contends that the ALJ improperly discounted Plaintiff's subjective complaints of pain and that her findings regarding Plaintiff's daily activities are not supported by the record. Although Plaintiff does not directly challenge the ALJ's analysis of her credibility, she does challenge the ALJ's characterization of her daily activities and how they relate to her RFC determination.

The ALJ described Plaintiff's daily activities as follows:

> The only problems [Plaintiff] reported with her personal care was her need to use soft fabrics and not being able to shave due to skin sensitivity, and having chronic diarrhea; however, the record does not reflect any significant abnormalities in hygiene or appearance. [Plaintiff] also reported she could prepare simple meals, fold laundry, vacuum, go outside, drive a car, go shopping, manage her finances, read, and watch television. Additionally, despite the [Plaintiff]'s testimony otherwise, the [Plaintiff]'s treatment notes with her rheumatologist clearly note that she reported being quite achy due to gardening a lot, which does not support the claimant's allegations. The record does not reflect significant difficulties with cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for her grooming and hygiene, using telephones and directories, or using a post office. Based on the totality of the evidence, the claimant has engaged in substantial activities of daily living, the performance of which are inconsistent with her complaints of disabling symptoms and limitations which are consistent with the determined [RFC].

(Tr. 25).

At the hearing, Plaintiff testified that her symptoms, such as pain and fatigue, come and go. (Tr. 77). This is entirely consistent with the condition of fibromyalgia. See SSR 12-2p. Plaintiff testified she has flares one to two times a month that last three days to a week. During a flare, Plaintiff testified she is completely fatigued and exhausted and has pain throughout her entire body. She also testified that she is completely exhausted. (Tr. 77-79). During a flare, she stated that she remains reclined in her heated recliner chair with pillows under her feet and ankles, and that she lies in this position 6 hours out of an 8-hour day. (Id.) This testimony is consistent with notations in the medical records that Plaintiff was spending some days in a recliner because she

was in pain.  (Tr. 686).  In her findings regarding Plaintiff's daily activities, the ALJ did not acknowledge the fact that Plaintiff's pain comes and goes, or to the extent to which Plaintiff claimed she was incapacitated during a flare up.

It is also significant that the ALJ failed to address the impact Plaintiff's chronic fatigue has on her daily activities.  Plaintiff testified that she has fatigue as a symptom of her fibromyalgia, but also as a side effect of her medications.  Plaintiff's medical providers noted Plaintiff was fatigued or exhausted at almost every visit.  Plaintiff testified at the hearing that as a result of her fatigue she often falls asleep or takes naps during the daytime, which added altogether amount to about three to four hours a day. (Tr. 79).  In summarizing Plaintiff's daily activities, the ALJ did not acknowledge the fact Plaintiff often took long naps.  The ALJ failed to address Plaintiff's fatigue and the impact it has on her daily activities, and ultimately her ability to function in the workplace.

The Court also finds that the ALJ's summary of Plaintiff's daily activities is not consistent with the record as a whole.  For example, in summarizing Plaintiff's daily activities, the ALJ stated the only problems Plaintiff reported with self-care were difficulties shaving and the need for soft fabrics. (Tr. 25).  This statement is not accurate.  Plaintiff also reported that she cannot stand in the shower because she lacks balance, and she cannot get in and out of the bathtub on her own. (Tr. 262).  The ALJ noted that Plaintiff reported she could drive a car without qualification. (Tr. 25).  Plaintiff, however, testified she rarely drives a car because she is exhausted, and that she has fallen asleep driving. (Tr. 86).  The ALJ also wrote that Plaintiff could prepare simple meals, fold laundry, vacuum, and go shopping.  At the hearing, Plaintiff testified that she cannot do housework when she is having a flare-up of fibromyalgia, and when she is not having flare-up, she does chores for five or ten minutes and she then needs to sit down. (Tr. 87).  She testified that she occasionally shops about once a week, but she needs to lean on a cart.  In her function report, Plaintiff wrote

31

that she could make herself a sandwich or something frozen, but she is unable to stand to cook a meal.  (Tr. 263).  The ALJ did not include this information in her summary of Plaintiff's daily activities.

The ALJ focused on the fact that in August 2018, Plaintiff reported to her rheumatologist that she had been gardening. At the hearing, Plaintiff testified that Dr. Velazquez had misunderstood her, and that she had told the doctor that in the past she liked to garden, but she was unable to do it anymore. Even if Plaintiff was gardening in August 2018, this is not inconsistent with the ups and down of fibromyalgia.  It was error for the ALJ to have focused on this one incident without acknowledging that there was no other evidence in the record of Plaintiff doing activities inconsistent with her claims of impairment.[7]  SSR 12-2p  (the ALJ should look at the "longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have bad days and good days.'") (internal quotations omitted).  Taken as a whole, the Court finds the ALJ's statement that Plaintiff has no significant difficulties with cleaning, shopping, cooking, maintaining a residence, and caring appropriately for her grooming and hygiene is not supported by the record.

The ALJ also pointed to some factors that were not at issue in the case or were irrelevant to Plaintiff's ability to do work-related functions. The ALJ asserts that Plaintiff has no difficulties using public transportation, telephones and directories, or using a post office, and finds this inconsistent with complaints of disabling symptoms and limitations. The Court has reviewed the record in this case and finds the issue of using public transportation, telephones and directors, or post offices did not even arise in this case. In the Court's view, this is likely boilerplate language, which is irrelevant to this particular plaintiff's ability to function in the workplace. It is also

---

[7]The ALJ acknowledged Plaintiff had a long work history with good earnings, which is consistent with Plaintiff's claims regarding the impact of her symptoms.  (Tr. 25).

irrelevant that Plaintiff can read and watch TV, as these activities are not inconsistent with Plaintiff's reported symptoms.  Reed v. Barnhart, 399 F.3d 917, 24 (8th Cir. 2005) ("this court has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the findings that a claimant can perform full-time competitive work.").

Plaintiff's testimony was consistent with complaints of pain and fatigue, which have been recognized in cases involving claimants who have been diagnosed with fibromyalgia. Tilley, 580 F.3d at 681 (noting that fibromyalgia's characteristics include chronic and widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of those muscles); Brosnahan, 336 F.3d 671, 678 (8th Cir. 2003) (citing Kelley, 133 F.3d at 589) ("fibromyalgia can be disabling because of its potential for sleep derangement and resulting daytime fatigue and pain").  The ALJ's findings regarding Plaintiff's daily activities were not supported by the record.  The ALJ's summary omitted some of Plaintiff's reported limitations in doing daily activities, which were not contested.  The ALJ also failed to consider the effect Plaintiff's flare-ups had on her daily activities, as well as her fatigue. Moreover, the ALJ discredited Plaintiff's claims of impairment based on the fact that Plaintiff can perform some light activities, but these activities are not inconsistent with Plaintiff's claims of impairment and have little to do with Plaintiff's ability to function in the workplace.

## V.      Conclusion

The Court's task "is to determine whether the ALJ's decision 'complies with the relevant legal standards and is supported by substantial evidence in the record as a whole.'"  Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)).  The Court finds that it does not in this case.  For the reasons set forth above, the Court finds the reasons the ALJ found for discounting Dr. Velazquez's medical opinion and for

partially crediting Dr. Tschudin's opinion were not supported by the record and were inconsistent with controlling law and Social Security guidelines.  The Court further finds the ALJ's determination regarding the impact Plaintiff's symptoms of fibromyalgia had on her RFC is not supported by substantial evidence in the record as a whole.  The Court also finds the ALJ's findings regarding Plaintiff's daily activities are not supported by the record or are not inconsistent with Plaintiff's claims of impairment. Therefore, the Court remands this matter to the Commissioner for further proceedings consistent with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment will accompany this Memorandum and Order.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this _31st_ day of March, 2021.